**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **WESTGATE FINANCIAL CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **FILE NO.  1:09-CV-1069-WSD** |
| **HTCW, INC. and BRENDA LISTON,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

## I.      Introduction

This matter was tried before the Court, without a jury, on April 21, 2010.  In discussions with counsel at the Pretrial Conference and at trial, the parties agreed that the issues to be tried are as follows:

1.  Did Defendant HTCW fraudulently induce Westgate into the Factoring Agreement by the omission of information in the Application and Personal Financial Statement prepared, signed and submitted by Defendant Brenda Liston, and did Westgate reasonably rely on the omission of the information?

2.  Did Defendant HTCW defraud Westgate in factoring invoices to Westgate which did not reflect goods that had been sold and delivered to HTCW's customers?   If Westgate was not defrauded by HTCW in the submission of invoices for undelivered goods, did HTCW submit to Westgate invoices for undelivered goods and, if so, was this a breach of the Factoring Agreement?

3.  If Westgate breached the Factoring Agreement or was defrauded, in what amount was Westgate damaged, and in what amount should punitive damages be assessed if Westgate was defrauded?

4.  If HTCW is liable to Westgate, to what extent is Brenda Liston personally liable to Westgate under the Guaranty she executed in favor of Westgate when the parties entered into the Factoring Agreement?

## II.    Findings of Fact

### A.    Stipulated Background and Facts

Westgate Financial Corporation ("Westgate") is a New Jersey Corporation with its principal place of business in Hoboken, New Jersey.  Its business consists of purchasing accounts receivable without recourse against the person from whom accounts receivable are purchased in cases where the person obligated in the account is not able to pay the account.

2

In its factoring relationship, Westgate advances a portion of the purchase price for receivables it is buying at the time of its purchase of receivables from a company with which Westgate enters into a factoring agreement. The balance of the amount due to the person from whom accounts receivable are purchased is paid upon collection of the account, or 150 days if the account debtor is financially unable to pay the invoice and this inability to pay is undisputed by the parties to the agreement.

HTCW is a Georgia corporation with its principal place of business in Stockbridge, Georgia. Defendant Brenda Liston ("Liston") is the sole shareholder of HTCW and the director of its business operations, although Belinda Quinones assists her in managing HTCW's day-to-day business operations. In July 2008, HTCW was in the business of cutting and selling interfacing fabric to large retailers, including Wal-Mart.

In July 2008, Liston, on behalf of HTCW, applied to Westgate to enter into an agreement by which HTCW would factor HTCW's accounts receivable to Westgate. The application for the factoring agreement (the "Application") was signed by Liston representing she was the CFO of HTCW.[1] Liston also provided

---

[1] "CFO" is the common acronym for Chief Financial Officer.

Westgate with a "Personal Financial Statement" when HTCW applied to enter into a factoring relationship with Westgate (the "Personal Financial Statement").

The Personal Financial Statement was executed by Liston on July 3, 2008. In it, she again represented that she was HTCW's CFO. Based upon the Application and the Personal Financial Statement submitted by HTCW and Liston, Westgate approved the Application and agreed to enter into a factoring agreement with HTCW.

Effective as of August 15, 2008, Westgate and HTCW entered into a factoring agreement, pursuant to which HTCW agreed to sell to Westgate, and Westgate, among other things, agreed to purchase from HTCW, all of HTCW's present and future accounts, contract rights and other forms of obligations for the payment of money resulting from the sale of goods or the rendition of services by HTCW (the "Factoring Agreement").

As required by Westgate as a condition of entering into the Factoring Agreement, Liston executed and delivered to Westgate her "Guaranty Agreement." In the Guaranty Agreement, Liston promised to guarantee the payment and performance of HTCW's obligations to Westgate. "Obligations" was defined as:

> Loans, overdrafts, and any and every other kind of charge, debt or liability that exist now and those which arise after this Guaranty is signed, and any interest due on such debts and liabilities. It also

4

includes costs, expenses, the performance required of Client under
any and all agreements with Westgate that exist now and those which
arise after this Guaranty is signed.

Beginning in the fall of 2008 and continuing through February 27, 2009,
HTCW sold customer accounts receivable to Westgate pursuant to the Factoring
Agreement.  Westgate advanced a portion of the accounts receivable factored by
HTCW by wiring money to HTCW's bank account.  The amount advanced was
$790,500.00.

On February 23, 2009, Westgate sent its employee, Joseph Calla, to
HTCW's regular place of business in Georgia during business hours to review
HTCW's books and records, as allowed by the Factoring Agreement.  The purpose
of the visit was to review HTCW's business records to support the invoices HTCW
had factored to Westgate pursuant to the Factoring Agreement.  Following the
visit, Calla reported to Westgate that he had reviewed seventeen (17) HTCW
invoices and was unable, for eleven (11) of the seventeen (17) invoices, to find
documents to support that goods represented by the invoices had been shipped to
the customer invoiced for the shipments.

On February 27, 2009, HTCW's counsel, Jeremy Moulton, sent a letter to
Westgate in which he advised that HTCW was terminating its relationship with

Westgate.  He also advised Westgate that HTCW would not give Westgate further access to its records.

Westgate thereafter advised HTCW that it considered HTCW in default under the Factoring Agreement in the amount of $551,001.36, plus interest and other charges, and demanded payment.[2]

III.   **Further Findings of Fact and Conclusions of Law[3]**

A.   <u>The Application and Personal Financial Statement (Fraud by Liston)</u>[4]

Bruce Cohen, the president of Westgate, and Brenda Liston, the CFO of HTCW, negotiated the Factoring Agreement entered into between HTCW and Westgate.  As Westgate's president, Cohen is experienced in the factoring

---

[2]  Pursuant to the Factoring Agreement, Westgate obtained a writ of possession pursuant to its security interest in HTCW machinery and inventory.  The machinery and inventory were ultimately sold.  At trial, HTCW for the first time contended the sale of the machinery and inventory was not commercially reasonable.  The issue of commercial reasonableness of the sales was not listed in the Pretrial Order submitted in this case and otherwise had not been asserted as an issue in this case to be tried.  The Court ruled at trial that this issue was not a matter to be litigated and, at least, was an issue that HTCW had at some point abandoned, if in fact it ever was properly raised.

[3]  The parties agree that the Factoring Agreement and the Guaranty are governed by and are to be interpreted under New Jersey law.

[4]  Defendants did not file with the Court Findings of Fact and Conclusions of Law and the Court has only considered the Findings of Fact and Conclusions of Law submitted by Westgate.

business.  There is no evidence that he knew Ms. Liston's business experience or education when he negotiated the Factoring Agreement with her.  Cohen's and Liston's testimony regarding the negotiation of the Factoring Agreement and the information available to and used by Cohen in deciding to enter into the Factoring Agreement is contradictory.

Cohen testified that he relied exclusively on the Application and Personal Financial Statement prepared and present to him by Liston in deciding whether to enter into the Factoring Agreement on behalf of Westgate.  He specifically noted that Liston did not provide certain information requested by the Personal Financial Statement, as follows:

In the "Contingent Liabilities" section, Liston did not enter a dollar amount for "Legal Claims."

In the "Personal Information" section, the following questions were not answered:

"Are you a partner or officer in any other venture?  If so, describe."

"Are you a defendant in any suits or legal actions?"

"Have you even been declared bankrupt?  If so, describe."

Cohen stated that when Liston signed the Personal Financial Statement, she represented that the information in the statement was "true and correct" and that

when information was not provided he concluded Liston did not have information responsive to the questions posed.

Cohen also testified that he relied upon Liston's answer of "no" to the following two questions in HTCW's Application:

"Has the Company ever filed or had filed against a Bankruptcy or other insolvency proceeding?"

"Has any other company that an owner of the Company associated with ever filed for Bankruptcy or had filed against it other insolvency proceedings [sic]"

Cohen noted that Wal-Mart was listed on the Application as one of HTCW's largest customers with "monthly sales" of $1,200,000 and that Rose E Dee was a customer with an "Annual Invoice Amount" of $21,000.  Liston had represented this information to be "true and correct."

Neither HTCW nor Liston disputes that there was a pending lawsuit against HTCW, that Liston had an interest in some other small businesses, that Liston was a defendant in a lawsuit, or that Liston had filed for personal bankruptcy before the Personal Financial Statement was signed.  Cohen stated that, had any of the information omitted from or contained in the Personal Financial Statement and Application been provided or accurately represented, he would not have entered

8

into the Factoring Agreement.  Cohen offered this testimony even though he was

not aware of the materiality of the omitted or represented information including the

amount of the legal claims at issue, the nature of the case in which Liston was

involved, or the nature and size of the other businesses in which Liston had an

interest.

Liston does not dispute that she did not provide information responsive to

the questions or accurately represent information she did provide, as set forth

above.  She testified that the businesses in which she had an interest generally were

not active and that, although a salon was one in which she had invested, it was

being operated by a friend, and that her bankruptcy was filed 13 years before the

Personal Financial Statement was prepared.  She also testified about her

negotiations with Cohen.  She stated that HTCW was discussing a factoring

relationship with Westgate because her former factoring company, Sterling Bank,

had decided that because it was factoring a competitor of HTCW, it had a conflict

of interest and had to discontinue its factoring relationship with HTCW.  Cohen

had told Liston during their meeting that he knew everything about HTCW and

Liston because he had obtained credit reports on the company and had talked with

a business associate at Sterling Bank about the bank's factoring relationship with

HTCW.  Cohen claimed to Liston that the information he had from these sources

9

was the basis upon which he decided to enter into an agreement with HTCW on behalf Westgate.

The Court does not find credible Cohen's testimony that he relied on the Personal Financial Statement and Application, or that the information he says is missing from these two documents mislead him into entering into the Factoring Agreement. Cohen's testimony was discredited in a variety of ways. First, the Court listened carefully to the substance of the testimony Cohen offered and the manner in which he testified. Cohen's responses to the questions asked of him on these issues were programmed to provide support for the legal positions his company has taken in the litigation. He systemically provided pre-programmed responses to questions that suggested the answer he should give. The testimony was not believable.

The substance of his testimony discredited that he had relied on the Personal Financial Statement or Application in deciding to do business with HTCW. The facts were that Cohen did not make any effort to follow up on the completeness of the information provided in the documents. The failure to follow up compels the conclusion that the documents were not important to him. Cohen did not testify at all about the second page of the Personal Financial Statement on which none of the requested information was provided. The information requested on the second

page logically and necessarily would have been available from a person like Liston.  The second page requested information about Liston's real estate interests, life insurance, institution(s) that had extended credit, and interest in securities.  No information was provided in response to these ordinary and obvious questions.  It is not reasonable or believable that Cohen could have believed this form was complete or reliable.

Cohen's decision to enter into a factoring relationship with HTCW is more credibly based on the information he actively gathered in the form of credit information and more reliably on the information he received from his colleague at Sterling Bank, who was seeking to find a factoring replacement for his bank.

New Jersey law applies in this action.  Under New Jersey law, a party seeking to prove fraud must show, by clear and convincing evidence, that:

> First, defendant made a false representation of fact to plaintiff.
>
> Second, that defendant knew or believed it to be false.
>
> Third, that defendant intended to deceive plaintiff.
>
> Fourth, that plaintiff believed and justifiably relied upon the statement and was induced by it to act.
>
> Fifth, that as a result of plaintiff's reliance upon the statement, plaintiff sustained damage.

N.J. Model Civil Jury Charges § 3.30F (Approved Feb. 1992).  Considering the elements of fraud under New Jersey law and the facts presented in this case, the Court finds that Plaintiff has not proved by clear and convincing evidence that Liston made representations which HTCW or she believed to be false and that Plaintiff has failed to prove it justifiably relied on information that was not, or was inaccurately, provided in the Personal Financial Statement or the Application.  The Court finds that Plaintiff did not prove fraud in the inducement.

 B. <u>The Invoices (Fraud by HTWC and Liston)</u>

  The Factoring Agreement defined the relationship between Westgate and HTCW.  The agreement provided that HTCW would assign its receivables to Westgate and, the issuance of an invoice to a customer essentially constituted an assignment to Westgate of the receivable evidenced by the invoice.  HTCW agreed to maintain records to support the invoices it issued and to make those records available to Westgate for inspection upon reasonable notice.  The parties agreed that monthly accounts would be issued by Westgate to HTCW showing the invoices assigned by HTCW and the status of HTCW's account.  The Factoring Agreement also provided that invoices were assigned to Westgate without recourse against HTCW if the customer was unable to pay the invoice.  That is, Westgate assumed the risk of nonpayment as a result of a customer's inability to pay.

The parties agree that invoices in the aggregate amount $1,540,861.06 were factored by HTCW to Westgate.  The parties do not dispute that an invoice for which goods were not shipped was not an invoice upon which payment had to be made by Westgate.  The dispute in this case concerns invoices issued to Wal-Mart.  In fact, Plaintiff did not present any credible evidence to show that invoices issued to customers other than Wal-Mart were fraudulent or did not evidence goods sold and delivered by HTCW to customers other than Wal-Mart.  Wal-Mart, as the parties acknowledge, was HTCW's largest customer and it is Wal-Mart's invoices that are at issue in this case.

Plaintiff contends that most, if not all, of the invoices factored to it for goods sold to Wal-Mart were invoices representing goods that had not been shipped. Westgate quantifies the dollar amount of the invoices for which goods were not shipped as the amount of charge-backs made by Wal-Mart for invoices it received from HTCW.  Westgate claims this evidence shows that HTCW was forwarding to Westgate invoices representing goods that had not been delivered to Wal-Mart and that the factoring of those invoices defrauded Westgate.[5]  The evidence was further

---

[5] Liston acknowledged that HTCW did send invoices to Wal-Mart for goods that had not yet been delivered because Wal-Mart gave a final date by which a complete delivery was required to be made and thus Liston claimed it was

that the monthly account reconciliation statements provided to HTCW and the

account status information available to HTCW or online, showed the charge-backs

Wal-Mart took for undelivered goods and HTCW did not dispute that the charge-

backs claimed were unsupported or that goods for which charge-backs were taken

were actually delivered.

To corroborate the claimed fraud, Westgate introduced three documents

(Exhibits 8, 13 and 15) prepared by HTCW employee Belinda Quiones

("Quiones").  Each of these exhibits, entitled "Assignment of Accounts," was

prepared by Quiones.  On each document is a list of "credit memos" issued to Wal-

Mart, which essentially gives full credit for each invoice addressed by the credit

memo.  Westgate contends these documents and the dates on which they were

prepared were fraudulently created to cover up the fraud perpetrated on Westgate

when the invoices initially were assigned.

Defendant presented evidence on its supplier relationship with Wal-Mart,

Westgate's invoice assignment practices and procedures, how they differed from

and were more expensive than those of the previous factoring company, Sterling

Bank, and that a change in invoice assignment processing agreed to by Westgate,

---

allowable to invoice for goods the ultimate delivery of which would occur after the
invoice was sent.

resulted in confusion that resulted in errant invoicing to Wal-Mart.  The evidence further was that at some point, in an attempt to insure that all Wal-Mart invoices had been sent to Wal-Mart, Quinones, Liston and Thomas Kavanaugh, an account executive at Westgate, agreed that the Wal-Mart invoices were not in order and that action needed to be taken to insure the billing to Wal-Mart was correct and complete.  Quinones and Liston both testified that Kavanaugh told them to send duplicate invoices to Wal-Mart.  They were unequivocal on this point.  Kavanugh, in his very short direct examination, disputed that he told them to send duplicate invoices, although on cross examination he acknowledged that he discussed the invoice issue with Quinones and Liston, but could not recall specifically what was discussed or decided.

Quiones testified about the Assignment of Accounts/Charge-Back documents she created.  Although she was aggressively examined on whether the documents were created on the dates stated on the documents and was specifically asked if she created the documents to make it appear they were created on the dates stated on the document, she stated with resolve that she created the documents on the dates stated on the documents and that the documents were not fraudulent.

Quiones was a credible witness.  She does not work for Liston or her companies, and is employed now at a realty company.  She testified in a manner

which supported the credibility and truthfulness about the matters on which she offered her testimony.  The credit memos themselves appear on their face to give to Wal-Mart credit for the amounts stated in the duplicate invoices that apparently were sent to Wal-Mart.  Testimony elicited by Westgate on her cross-examination supported that orders evidenced by the invoices originally sent were fulfilled, albeit only in part, in a number of instances.  In its totality, the evidence supports that a decision was made to send duplicate invoices to Wal-Mart, these duplicates were not paid nor were they intended to double bill Wal-Mart, that steps were taken to give credit for the duplicates and that the duplicates were not sent to Westgate nor were advances made on them.

Westgate has not shown that, in forwarding any Wal-Mart invoices to Westgate pursuant to the Factoring Agreement, that Liston or HTCW intended to defraud Westgate or that any representations made to defraud Westgate or any other person.  While HTCW's invoicing practices may be irregular and unwise, Westgate has not shown by clear and convincing evidence that Defendants committed fraud in its invoicing practices.

C.     The Wal-Mart Invoices (breach of contract, damages and the Liston
       Guaranty)

Under New Jersey law, to prove a breach of contract a plaintiff must show

by a preponderance of the evidence that (1) a contract existed; (2) the Plaintiff

performed under the contract; (3) the defendant did not perform under the contract;

and (4) damages resulted from defendant's breach of the contract.  N.J. Model

Civil Jury Charges § 4.10A (1998).  Defendants do not dispute that the Factoring

Agreement and the Guaranty entered into by Liston were valid contracts.  They

also do not dispute that the Factoring Agreement was breached and that any

damages that can be proved resulting from such breach may be recovered by

Westgate from HTCW as a party to the Factoring Agreement and from Liston

based on her guaranty of HTCW's obligations.  Liston claims that Westgate has

not met its burden of proof to show damages with enough certainty for an award to

be made for breach of the Factoring Agreement, and thus Liston is not liable for

damages under the Guaranty.

This trial also constituted the Court's hearing on entry of a default judgment

against HTCW, in light of its decision not to participate in this matter after its

counsel withdrew and it elected not to retain counsel to represent it.  Under Rule

55 of the Federal Rules of Civil Procedure, the Court may hold a hearing after

entry of default against a defendant to determine damages.  Fed.R.Civ.P 55.  "The

entry of a default judgment is committed to the discretion of the district court."

Hamm v. DeKalb County, 774 F.2d 1567, 1576 (11th Cir. 1985), cert. denied, 475

U.S. 1096 (1986).  A court may award damages for default judgment "only if the

record adequately reflects the basis for award via a hearing or a demonstration by

detailed affidavits establishing the necessary facts."  Adolph Coors Co. V.

Movement Against Racism and the Klan, 777 F.2d 1538, 1544 (11th Cir. 1985).

The Court need only have a reasonable basis to reach a reasonable damage amount.

The evidence presented by Westgate on its alleged contract damages is

confusing and inconsistent.  At trial, Westgate presented the testimony of Dennis

Maluchnik, Westgate's CFO.  He testified as to his damage calculation.  The

calculation was unrefined and sought only to determine in a general way the losses

that Westgate suffered on the HTCW account.  It was at most loosely tied to

Westgate's breach of contract claim.  The damage calculation was based on the

submission of invoices to Wal-Mart which represented goods that generally were

not delivered to Wal-Mart.  The parties agree that if Westgate was factored

invoices for which goods caused Westgate to make advances and incur costs it was

not required to incur, these amounts can be recovered by Westgate.  Defendants

claim damages are not recoverable because that cannot be shown with reasonable certainty.

At trial, Maluchnik testified that this gross loss amount, which included interest, commissions, advances and incidental costs for which HTWC was responsible for under the Factoring Agreement (postage, express mail, wire and check fees, audit expenses), totaled $776,388.30.  This calculated damage amount is, however, inconsistent with the damages claimed by Westgate in its March 3, 2009, letter to HTCW in which Westgate demanded payment in the amount of $551,001.36 for all amounts due and owing Westgate, plus accrued interest and the cost to enforce its security interest and legal expense and attorneys fees to collect the amounts due and owing it.  This calculated amount apparently also does not take into account that the alleged contract breach is provable only with respect to Wal-Mart invoices.

While the summary calculation offered by Maluchink is helpful, it is required to be adjusted to reflect damages attributable only to Wal-Mart invoices[6]

---

[6]  Westgate acknowledged at the conclusion of the trial that the only evidence that charge backs were for undelivered goods were for charge backs from Wal-Mart. In fact, Westgate did not provide any evidence regarding invoices to and charge backs from any company other than Wal-Mart and the Court has determined there is insufficient evidence to support a claim for damages on invoices to any company other than Wal-Mart.

and only for those expenses upon which there was evidence that the expenses were required to be paid by HTCW under the Factoring Agreement.  Evidence in the record allows the Court reasonably to determine that the invoices attributable to Wal-Mart totaled $1,423,962.22 and charge backs totaled $1,159,256.54 on Wal-Mart invoices for net Wal-Mart sales of $264,705.68.  Wal-Mart profits accounted for 62% of profit on all accounts.  Thus, 62% of all Factoring Agreement expenditures on which evidence was produced at trial, less attorneys' fees, which are considered separately, are allocated to the Wal-Mart invoices.  This 62% expenditure allocation is in the amount of $600,768.54.  Total contract losses are in the amount of $336,062.86.

1.    *Attorneys' fees and expenses.*

The Court has reviewed the attorneys' fees and expenses claims, which are set out in Exhibits 35 (fees and expenses of Cohen Pollock Merlin & Small) and 36 (fees and expenses of Seyfarth Shaw).

Cohen Pollock and Seyfarth Shaw seek fees and expenses in connection with this litigation as follows:

Cohen Pollock:

| | |
|---|---|
| Attorneys' fees: | $ 25,549.00 |
| Expenses: | $    731.67 |

Seyfarth Shaw:

Attorneys' fees:   $105,572.50

Expenses:          $   7,809.49

Plaintiff is entitled to recover attorneys' fees only for its successful breach of contract claim.  This action, however, was substantially driven by, and the attorneys' fees and expenses were incurred to, prosecute fraud claims which were not successful.  It is difficult to do an interlineated evaluation of the services to allocate them to prosecution of the fraud as opposed to prosecution of the breach of contract claims, and some of the services performed were useful to prosecute both fraud claims.  Applying the Court's experience in litigating claims of this type and knowing the demands of prosecuting an alleged claim of fraud, the Court determines that 30% of the fees incurred in this action were used exclusively to prosecute the fraud claims.  Cohen Pollard's and Seyfarth Shaw's fee requests are required to be reduced by this percentage.  Thus, the Court awards fees and expenses[7] in the following amounts:

---

[7]  The Court concludes that all expenses benefited prosecution of the breach of contract claim.

Cohen Pollard:   $17,884.30

Seyfarth Shaw:   $73,900.75

Expenses:        $ 8,541.16

## IV.  Conclusion

Based on these findings of fact and conclusions of law

**IT IS HEREBY ORDERED** that verdict and judgment is entered in favor of the Plaintiff and against Defendants HTCW and Brenda Liston, jointly and severally on Plaintiff's claims of breach of contract in the amount of $436,389.07.

**IT IS FURTHER ORDERED** that a verdict and judgment is entered in favor of the Defendants on Plaintiff's claims of fraud.

**SO ORDERED** this 2nd day of July, 2010.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE